## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NORMAN MICHAEL VEGA** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MICHAEL MULLEN et al.,** | : | **NO. 16-4620** |
| *Defendants.* | : | |

## M E M O R A N D U M

PRATTER, J.                                        February 13, 2018

### INTRODUCTION

Norman Michael Vega's five-year-old daughter tried to send him a birthday card in prison. That simple act gave rise to three alleged violations of Mr. Vega's First and Fourteenth Amendment rights.

First, a free speech violation: because the prison prohibited mail with crayons or colored pencil, Mr. Vega never received the card. Second, a due process violation: because the prison destroyed the card before Mr. Vega was notified, he could not challenge the mail staff's determination that the card contained crayon. Third, unconstitutional retaliation: because Mr. Vega subsequently filed this lawsuit against the prison, the mail staff has further interfered with his mail.

The prison defendants have filed a motion to dismiss Mr. Vega's amended complaint. The Court denies the motion as to the free-speech and due process counts. The Court dismisses the retaliation count as to all but defendant Michael Mullen.

### FACTS

The facts of Mr. Vega's case are intertwined with the Berks County Jail policies that he challenges: the crayon policy, the colored-pencil policy, and the destruction policy.

### A.  Policies Prohibiting Colored Drawings

In April 2016, the Berks County Jail Inmate Handbook was amended to state that mail containing "colored crayon markings . . . may be restricted."  Mr. Vega alleges that prison officials did not adopt this new crayon policy "in response to any specific attempts to use crayons to conceal drugs or other contraband in mail."  Am. Compl. ¶ 19.

Soon after the crayon policy was adopted, Mr. Vega asked whether his daughter could send him a card containing colored pencil.  He was told that "colored pencil will be confiscated."  The prison officially set out this colored-pencil policy in a May 2016 memorandum, which prohibited any mail "containing writing or drawings with excessive crayon, colored pencil, marker, [or] highlighter."  Like the crayon policy, the colored-pencil policy was not adopted "in response to any specific attempts to use colored pencils to conceal drugs or other contraband in mail."  Am. Compl. ¶ 26.

### B.  Destruction Policy

In light of the crayon and colored-pencil policies, Mr. Vega told his family that his daughter should send a birthday card drawn with only pen and regular pencil.  According to the amended complaint, she did so, but the mailroom destroyed the card anyway.

Prison policy is to destroy confiscated mail without notice to the intended recipient.  As the prison's official policy puts it, pieces of mail with crayon or colored pencils are "handled at the sole discretion of the mail room supervisor.  [They] are considered contraband and will be destroyed.  Inmates will not be called down to sort through items prior to the mail room completing this task."  Am. Compl. ¶ 37.  In keeping with this policy, the mailroom did not notify Mr. Vega of the card until after it had been destroyed.

According to the mailroom, the card from Mr. Vega's daughter contained crayon. Because the card was gone, Mr. Vega had no evidence to contradict the mail staff's description of the card. Without any evidence to support his case, Mr. Vega's internal grievance with the prison failed.

### C. Postscript: Prison Officials Retaliate Against Mr. Vega

Mr. Vega sued several prison officials in late 2016. In response, the prison allegedly retaliated against him by interfering with his mail. Although Mr. Vega's amended complaint alleges ten instances of retaliation, it only details two.

First, Mr. Vega ordered a book about prison litigation from an online retailer in January 2017. The prison mail staff rejected the book for being overweight. So Mr. Vega's lawyer tried to bring him the book in person. Again, the prison staff refused to let Mr. Vega have the book. Only when the lawyer filed a motion in state court in March 2017 did the prison staff relent.

Second, Mr. Vega's family tried to send him a children's book that he could read to his daughter over the phone. The mail staff rejected the book for having "grid paper," even though the Berks County Jail Handbook does not prohibit books with grid lines.

## PROCEDURAL HISTORY

At first, Mr. Vega sued the prison *pro se*. This Court granted the prison defendants' motion to dismiss and granted Mr. Vega leave to file an amended complaint. *See Vega v. Mullen*, No. CV 16-4620, 2017 WL 1021064 (E.D. Pa. Mar. 16, 2017).

Since then, Mr. Vega has secured legal representation and has filed a four-count amended complaint:

- **Free Speech:** Counts 1 and 2 challenge the crayon and colored-pencil policies on free-speech grounds, alleging that neither policy is "reasonably related to a legitimate penological interest."

- **Due Process:** Count 3 challenges the destruction policy on due process grounds, alleging that summarily destroying the birthday card deprived Mr. Vega of a meaningful post-deprivation hearing.

- **Retaliation:** Count 4 alleges that prison staff members have retaliated against Mr. Vega for exercising his constitutional rights to file an internal grievance with the prison and to file a lawsuit in this Court.

The defendants are five officials at the Berks County Jail. Three are responsible for mailroom policies: the warden (Janine Quigley), the mailroom supervisor (Michael Mullen), and the commissioner of the Berks County prison board (Kevin Barnhardt). Two are responsible for the grievance procedures surrounding the destruction of the birthday card: the chief deputy warden (Jeffrey Smith) and the lieutenant booking supervisor (Jennifer Sharp).

All have joined in the motion to dismiss that is currently before the Court. The Court heard oral argument on the motion.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is]

sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation marks omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). Also, the Court must accept as true all reasonable inferences emanating from the allegations, and view those facts and inferences in the light most favorable to the nonmoving party. *See Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or even discount reality. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

**ANALYSIS**

The Court addresses the arguments surrounding (i) the alleged free-speech violations, (ii) the alleged due process violation, and (iii) the alleged retaliation. First, because the case requires further factual development about a connection between the colored-drawing policies and the prison's interest in thwarting drug smuggling, the Court denies the motion to dismiss the free-speech counts. Second, as to the due process count, the Court finds that the post-deprivation procedure, as alleged, was not meaningful. Third, although Mr. Vega has pleaded every element of his retaliation claim, he has failed to plead the personal involvement of every defendant.

## I.    Crayon & Colored-Pencil Policies – First Amendment

A prison regulation that restricts inmates' First Amendment rights must be "reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987).[1]  The Supreme Court has set out a four-factor test for determining when this standard is satisfied:

1) There must be a rational connection between the prison regulation and a legitimate government objective.

2) Inmates must retain other ways to exercise their rights.

3) Accommodating the right in the manner the prisoner seeks would have significant negative ripple effects on other inmates or on prison staff.

4) There are no alternative policies that would fully accommodate the prisoner's rights at little cost to valid penological interests.

*Id.* at 89–91.

In the Third Circuit, the four factors are grouped into two distinct steps.  At step one, a court analyzes only the first factor: "whether there is a valid, rational connection between the prison regulation and the legitimate interest put forth to justify it."  *Fontroy v. Beard*, 559 F.3d 173, 177 (3d Cir. 2009) (quoting *Monroe v. Beard*, 536 F.3d 198, 207 (3d Cir. 2008)).  If the connection is *rational* at step one, then a court must determine whether it is also *reasonable* by evaluating the remaining factors at step two.  *See id.* at 178; *Monroe*, 536 F.3d at 207.  Because the case requires further factual development about the connection between the mail policy and the prison's interest in thwarting drug smuggling, the Court goes no further than step one of the *Turner* analysis to deny the motion to dismiss counts 1 and 2.

At step one, the prison must demonstrate a "rational connection" between the crayon and colored-pencil policies and a "legitimate government interest put forward to justify it."  *See*

---

[1]    Even though the card was drawn by his daughter, Mr. Vega retains a First Amendment interest in it.  *See, e.g.*, *Fontroy v. Beard*, 559 F.3d 173, 177 (3d Cir. 2009); *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006).

*Turner*, 482 U.S. at 89.  In evaluating whether such a rational connection exists, the Court must defer to the "professional judgment" of prison officials, while still requiring more than a mere "conclusory assertion."  *See Monroe*, 536 F.3d at 207.

In this section, the Court (A) sets out the standard for deciding step one at the motion-to-dismiss stage; (B) summarizes analogous cases decided on a motion to dismiss (that is, without evidence); (C) summarizes cases decided at summary judgment (that is, with evidence that this case currently lacks); and (D) refutes two points raised by the prison about the "obviousness" of the connection here.  Because the case currently lacks an evidentiary record of the connection between crayon drawings and smuggled drugs, the Court denies the motion to dismiss these counts.

### A.  Standard for Finding a "Rational Connection" at the Motion-to-Dismiss Stage

Because the prison officials have filed a motion to dismiss, rather than a motion for summary judgment, they must climb a steep hill to show a rational connection.  A ruling "based only on the pleadings" is appropriate only when the connection between challenged policy and government interest is "a matter of common sense."  *Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d Cir. 2002); *see also Jones v. Brown*, 461 F.3d 353, 360–61 (3d Cir. 2006) ("[W]here the connection is obvious, common sense may suffice.").  In other instances, "in which the connection is not so apparent," the Court should await further "factual development."  *Wolf*, 297 F.3d at 308.  To decide whether a rational connection is obvious enough to be found at the motion-to-dismiss stage, the Court considers "the nature of the right, the nature of the interest asserted, the nature of the prohibition, and the obviousness of its connection to the proffered interest."  *Id.* at 308–09.

**B. The Connection Here Is Not "Obvious" Enough to Be Resolved on a Motion to Dismiss**

The link between crayon drawings and drug smuggling is not so "obvious" that the Court can rely on "common sense" to resolve the case. Mr. Vega alleges that the policies were not implemented in response to actual attempts to smuggle drugs. *See* Am. Compl. ¶ 19.

The Third Circuit Court of Appeals has provided some helpful data points to situate this case — the obviousness of smuggling drugs via crayon drawings — among other *Turner* cases. *See Wolf*, 297 F.3d at 309. Examples of "obvious" connections that a court could resolve on the pleadings are:

- A policy prohibiting "inmate gatherings in prison common areas after 11-o'clock at night." *Id.*

- A policy banning "publications that featured escape plans." *Id.* (citing *Amatel v. Reno*, 156 F.3d 192, 206 (D.C. Cir. 1998) (Wald, J., dissenting)).

- A ban on "instructions on assembling weapons." *Id.* (citing *Giano v. Senkowski*, 54 F.3d 1050, 1059–60 (2d Cir. 1995) (Calabresi, J., dissenting)).

- A prohibition on "distributing sexually explicit magazines to 'repetitive and compulsive' sexual offenders." *Id.* (quoting *Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999)).

The link between a policy banning crayon drawings and drug-free prisons is not as obvious as, say, the link between a policy prohibiting escape plans and safe prisons.

On the other hand, the crayon drawing–drug smuggling connection is stronger than the Third Circuit Court of Appeals' examples of clearly *non*obvious cases. In *Wolf*, for instance, the court rejected the argument that a ban on R-rated movies in prison would so obviously deter criminal behavior in the general population that the ban could be upheld at the motion-to-dismiss stage. *Id.* at 309.

Two years later, in *Ramirez v. Pugh*, 379 F.3d 122 (3d Cir. 2004), the court considered a policy prohibiting sexually explicit material not only from sex offenders, but also from the entire prison population. *Id.* at 128. The court held that the connection between the policy and the government's interest in rehabilitating the *entire* prison population was "attenuated" and therefore remanded for district court to develop a "factual record" and decide the case on summary judgment. *Id.* Here, the prison's goal of keeping drugs away from even non–drug offenders is more obviously linked to rehabilitation than a policy keeping sexually explicit materials away from even non–sex offenders.

### C. Mail-Restricting Cases Decided with an Evidentiary Record

The parties analogize to cases decided with a full evidentiary record. In other words, they argue about apples, when this case — at least for now, at the motion-to-dismiss stage — is still about oranges. These three cases may become instructive at summary judgment because they concern restrictions on prisoners' access to the mails. For now, they serve to further highlight the ways in which courts use evidentiary records to find (or reject) a "rational connection" between a rights-restricting policy and a legitimate government objective.

In *Turner* itself, the challenged policy restricted mail between inmates at different prisons. The Court relied on trial testimony to find a rational connection between the policy and the prison system's goals of reducing prison violence. Prison officials testified that "mail between institutions can be used to communicate escape plans and to arrange assaults" and noted the "growing problem" of prison gangs. *Turner*, 482 U.S. at 91. The Court used this evidentiary record to find a rational connection.

Likewise, in *Fontroy v. Beard*, the prison system imposed restrictions on attorney-prisoner mail in an effort to clamp down on drug smuggling. *See* 559 F.3d 173, 174 (3d Cir.

2009). The court found a rational connection between the policy and the government's stated interest, but only after consulting a thorough evidentiary record. For instance, the court noted the "larger systemic problems" of the old mail policy, as evidenced by fifteen instances in a 13-year period in which drugs were smuggled into the prison via mail from attorneys. *Id.* at 178–79. *Fortnoy* simply highlights what this case currently lacks: a robust evidentiary record supporting the connection between prison mail policy and the government's interest in thwarting drug smugglers.

By contrast, not even an evidentiary record could demonstrate a rational connection in *Jones v. Brown*, 461 F.3d 353 (3d Cir. 2006). As in *Fontroy*, the *Jones* case involved restrictions on attorney-prisoner mail. Unlike *Fontroy*, however, the government interest in *Jones* was in "reducing the risk of anthrax contamination." *Id.* at 355–56. When it came time for the prison to establish a rational connection between the restrictions and its interest in stopping anthrax attacks, the prison "rel[ied] solely on the generally known facts regarding the events of September 11, 2001, and the letters posted in October of 2001 containing anthrax spores." *Id.* at 362. But any such connection was too remote: because the prison failed to provide "information suggesting a significant risk of an anthrax attack," the court held that no rational connection existed between the prison mail policy and the government's interest in stopping an attack. *Id.* at 364. Similarly, here, the prison relies on general knowledge about drug smuggling in prisons — not enough to establish a connection under *Jones*.

### D. Refuting the Prison's Evidence of "Common Sense"

The prison relies on two cases to support its contention that the connection between the ban on crayon drawings and the prison's interest in stopping drug smuggling is common sense.

First, the prison relies on a Fourth Amendment seizure case from Maine. In rejecting a prisoner's challenge to the confiscation of his drawings, the court stated that "[c]olor are considered contraband at the jail because some colored drawings have been used to conceal drugs. The inmates then lick or swallow the colored paper to get high." *Goguen v. Gilblair*, No. 12-CV-00048, 2013 WL 5407225, at *14 (D. Me. Sept. 25, 2013). Given that the colored-drawing policy was not challenged on First Amendment grounds, the case has little to say about the merits of the motion to dismiss before the Court. And a single, unpublished decision from Maine does not demonstrate that the drug-trafficking threat of colored drawings is so "obvious" that this case can be resolved on a motion to dismiss.

Second, the prison cites a settlement agreement in a New Hampshire case in which the prison was allowed to continue prohibiting crayon and colored-pencil drawings. *See* Mot. to Dismiss, Ex. A.

As an initial matter, the New Hampshire court's approval of the settlement agreement does not mean that the court considered whether the crayon and colored-pencil policies passed First Amendment muster. Even if it did, the Third Circuit Court of Appeals has warned that courts must think for themselves: a court seeking to "bolster its finding of a connection by reference to decisions of other courts on the same issue" must still "engage in at least some independent analysis of whether the connection is rational." *Ramirez*, 379 F.3d at 130 n.3 (quoting *Wolf*, 297 F.3d at 309).

More fundamentally, the comparison to a similar policy in another prison system simply highlights the contextual nature of the inquiry. In *Fontroy*, the prisoners had pointed to the more permissive federal prison policy as evidence that the challenged state policy was unconstitutional. The court eschewed the relevance of a comparison to the federal system: the

two mail policies, the court held, "should be analyzed on their own terms." *Fontroy*, 559 F.3d at

182. So too here: the court-approved New Hampshire policy and the policy here must be

evaluated on their own terms. Perhaps drug-laced crayon drawings are a bigger problem in New

Hampshire. Once again, the Court needs a factual record before it can decide.[2]

## II. Destruction Policy – Fourteenth Amendment Due Process

Mr. Vega's due process count alleges (1) that the prison provided him no pre-deprivation

procedure to challenge the confiscation of the birthday card, and (2) that the post-deprivation

procedure was inadequate because the card had already been destroyed.

In prison, "[p]re-deprivation notice is not constitutionally required." *Monroe*, 536 F.3d at

210. Instead, "prisons are constitutionally required to afford inmates only a post-deprivation

remedy." *Id.* The post-deprivation hearing must be "meaningful." *Hudson v. Palmer*, 468 U.S.

517, 533 (1984).

In last year's opinion dismissing the original complaint, this Court wrote that "Mr. Vega

apparently had access to adequate post-deprivation remedies." *Vega*, 2017 WL 1021064, at *4.

The Court explicitly "presume[d] that the available procedures were not mere shams" and noted

that "Mr. Vega makes no such claim here." *Id.* Mr. Vega now makes that claim.

First, the Court denies the motion to dismiss because Mr. Vega has alleged that the post-

deprivation procedure was not meaningful. Second, the Court rejects the prison's argument that

it would have been "impracticable" to provide Mr. Vega with a more meaningful hearing.

---

[2]     Because the prison has not "met [its] burden under the first step of *Turner*," the inquiry is over and the Court will "proceed no further." *See Jones*, 461 F.3d at 364.

### A. The Post-Deprivation Procedure Was Not "Meaningful."

Mr. Vega argues that his post-deprivation review, as alleged, was not meaningful because the birthday card had already been destroyed. The Court agrees. Without examining the card, there was no good way for a reviewer to tell whether the card actually contained crayon or colored pencil.

Mr. Vega's position finds support in *Sherwood v. Beard*, No. 2:11-CV-40, 2013 WL 1687834 (W.D. Pa. Apr. 18, 2013). In that case, an inmate on death row alleged that "a number of boxes of his legal materials were confiscated," never returned, and possibly destroyed. *Id.* at *3. The court held that "[s]uch an unexplained and uncontroverted state of affairs cannot summarily be said to be meaningful." *Id.* So too here: the confiscated and summarily destroyed birthday card suggests that Mr. Vega has been deprived of a meaningful post-deprivation procedure.

The destruction of the card also sets Mr. Vega's case apart from *Monroe*. In that case, prisoners complaining of unlawful deprivations had the chance "to review materials and receive back approved, non-contraband items." *Monroe*, 536 F.3d at 210. If Mr. Vega had received such an opportunity, he probably would not have brought this lawsuit.

The destruction of the birthday card also means that Mr. Vega's recourse to a state tort claim would not be meaningful. In *Miller v. Diguglielmo*, Judge Baylson explained that a private tort action was sometimes "an adequate post deprivation remedy." *See Miller v. Diguglielmo*, No. CIV.A. 07-2686, 2011 WL 382624, at *15 (E.D. Pa. Feb. 4, 2011) (citing *Tapp v. Proto*, 404 Fed. App'x 563, 567 (3d Cir. 2010); *Mattis v. Dohman*, 260 Fed. App'x 458, 461 (3d Cir. 2008); *Alexander v. Gennarini*, 144 Fed. App'x 924, 925 (3d Cir. 2005)). But on the facts presented in *Miller*, it was not: the *Miller* plaintiff had lost his property — a ring — "through no fault of [his

own]," and without the ring, the plaintiff would be "severely handicapped" in a tort law suit.  *Id.*  Similarly, here, the birthday card is gone through no fault of Mr. Vega, and its absence would severely handicap his case in a tort lawsuit.

As a last resort, the prison defendants argue that the post-deprivation procedure could still be meaningful even without the card: the reviewer could still evaluate Mr. Vega's credibility against that of the mail room staff.  But such a procedure is not a fair fight: in a contest between the word of a prisoner and the word of a mailroom staff member (the reviewer's colleague, no less), the playing field is tilted decidedly against the prisoner.

### B.  It Is Beside the Point that a Post-Deprivation Hearing May Not Be Practicable.

Aside from the meaningfulness of the post-deprivation hearing, the prison mounts a separate defense: the post-deprivation procedure that Mr. Vega demands is not *practicable*.  The prison questions the wisdom of retaining — and letting prisoners inspect — potentially drug-laced drawings while a post-deprivation challenge runs its course.

The prison's concerns about practicability miss the point.  In the prison due process context, the Supreme Court has discussed practicability when explaining why a *pre*-deprivation procedure for an *unauthorized* act is not required: "when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur."  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).  Here, by contrast, the card was destroyed pursuant to a prison policy, not an unauthorized act, and Mr. Vega challenges the adequacy of the *post*-deprivation procedure.

### III.   Retaliation – First Amendment

Mr. Vega alleges that the prison defendants retaliated against him for exercising his constitutionally protected rights to file an internal prison grievance and to file this lawsuit.

The prison defendants challenge this count in two ways:  First, they argue that Mr. Vega has not pleaded all the elements of retaliation.  Second, they argue that he has not alleged personal involvement of all defendants in the retaliation.  Although Mr. Vega has pleaded every element of a retaliation claim, he has failed to plead the personal involvement of every defendant.

#### A.   *Mr. Vega Has Pleaded All Elements of a Retaliation Claim.*

"A prisoner alleging retaliation must show (1) constitutionally protected conduct, (2) an adverse action by prison officials 'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights,' and (3) 'a causal link between the exercise of his constitutional rights and the adverse action taken against him.'"  *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)).

The prison defendants dispute only the first two elements of the retaliation rule.

#### 1.   *Mr. Vega's Conduct Was Constitutionally Protected.*

The prison concedes that filing a lawsuit is a constitutionally protected activity.  Instead, the prison argues that filing an internal grievance is not a constitutionally protected activity.  The prison is correct that "a state grievance procedure does not confer any *substantive* constitutional right upon prison inmates."  *Bartelli v. Jones*, 231 Fed. App'x 129, 132 (3d Cir. 2007) (quoting *Hoover v. Watson*, 886 F. Supp. 410, 418 (D. Del. 1995)) (emphasis added).

But, as the name suggests, a grievance system is an example of the right to petition government for the redress of grievances.  *Cf.* U.S. CONST. amend. I (protecting "the right of the

people . . . to petition the Government for a redress of grievances"). The Third Circuit Court of Appeals has recognized as much: the "filing of a grievance to complain about [a prison officer's] behavior is constitutionally protected conduct." *Robinson v. Taylor*, 204 Fed. App'x 155, 157 (3d Cir. 2006); *see also Mitchell*, 318 F.3d at 530 (same). Several other circuits have done so as well. *See, e.g.*, *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments . . . .").

### 2. Interfering with Mr. Vega's Mail Was an Adverse Action.

If a state action would "deter a person of ordinary firmness from exercising his First Amendment rights," then that action is adverse for purposes of unconstitutional retaliation. *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000). This inquiry "will depend on the facts of the particular case." *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000).

Interfering with a prisoner's mail would deter a prisoner of ordinary firmness from exercising his rights. Mail is one of a prisoner's only connections with the outside world. And here, the prison interfered with an extremely important connection — the relationship between Mr. Vega and his young daughter.

A court within this district has already held that interference with prisoner mail was evidence of an adverse action. *See Wheeler v. Beard*, No. 03-CV-4826, 2005 WL 1840159, at *3 (E.D. Pa. Aug. 3, 2005). To be sure, in that case, interfering with mail was only one of a litany of adverse actions. The other adverse actions included denying medical treatment, ransacking the prisoner's cell, and withholding prison-issued necessities such as underwear. *Id.* In other words, interference with the mail may have been sufficiently adverse only when taken together with the prison officials' other hostile actions.

The prison defendants rely on a recent California case, *Quiroz v. Horel*, 85 F. Supp. 3d 1115 (N.D. Cal. 2015), for the notion that interference with prisoner mail is not an adverse action. The *Quiroz* court held that a prisoner who complained that his mail had been interfered with had not demonstrated an adverse action. *Id.* at 1138. But *Quiroz* is distinguishable both on the facts and on the law.

As to the facts: the prisoner in *Quiroz* complained of three instances of delayed mail. In each instance, the prisoner's complaints were "promptly" addressed and his mail was delivered. *Id.* Thus, the *Quiroz* court concluded that the prisoner was not actually injured. *Id.* Here, by contrast, Mr. Vega has alleged that ten pieces of mail are still missing, including a children's book that he wanted to read to his daughter.

As to the law: the *Quiroz* court noted that the delayed mail did not stop the *Quiroz* prisoner from pursuing his claim: "plaintiff has not shown that these instances of stopped mail chilled the exercise of his First Amendment right to file grievances or lawsuits." *Id.* at 1137. Likewise, here, the prison defendants correctly point out that the missing mail has not deterred Mr. Vega from pursuing his lawsuit. But this argument disregards the relevant test, which is whether "*a person of ordinary firmness*" would be deterred. *Suppan*, 203 F.3d at 235. The *Quiroz* court appears not to have applied this ordinary-firmness rule, which further saps the opinion of its persuasive value.

### B. Mr. Vega Has Not Sufficiently Alleged the Personal Involvement of All Defendants.

"A defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981)). Although defendants may be liable based on their "knowledge and acquiescence," such involvement must be alleged "with appropriate particularity." *Id.*

The amended complaint lists only the actions of Mr. Mullen, the mailroom supervisor, in the count for retaliation.  Thus, the other prison defendants argue that they should be dismissed from the count for retaliation.

In supplemental briefing after oral argument, Mr. Vega has agreed to dismiss the defendants other than Mr. Mullen from the retaliation count.  If discovery turns up evidence of their knowledge and acquiescence, then Mr. Vega may amend his complaint at that later time.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted in part and denied in part.  An appropriate order follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE